[Cite as *In re N.I.*, 2024-Ohio-968.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE N.I., ET AL.                    :

Minor Children                        :

                                          No. 112802

[ Appeal by Parents]                  :

                                          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** March 14, 2024

---

Civil Appeal from the Cuyahoga County Common Pleas Court
Juvenile Division
Case Nos. AD-22-912668 and AD-22-912669

---

### *Appearances:*

Kate Pruchnicki, *for appellants*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Zachary J. LaFleur, Assistant Prosecuting
Attorney, *for appellee*.

ANITA LASTER MAYS, J.:

{¶1} Defendants-appellants, parents of N.I. and J.I. ("the children") appeal the trial court's adoption of the magistrate's decision adjudicating J.I. abused and dependent and N.I. dependent and committing the children to the temporary

custody of the Cuyahoga County Division of Children and Family Services ("CCDCFS"). We find that the trial court erred in adopting the magistrate's decision and reverse the trial court's judgment.

## I. Procedural History

{¶2} On December 9, 2022, CCDCFS filed for temporary custody alleging J.I. to be abused and dependent and alleging N.I. to be dependent pursuant to R.C. 2151.031, 2151.04, and 2151.33.[1] CCDCFS was granted predispositional custody of the children on December 21, 2022, and an adjudicatory hearing was scheduled for April 14, 2023. On April 7, 2023, the parents moved to continue the April 14, 2023, proceedings because their medical experts, who are located outside of Ohio, were unable to appear at the proceedings due to scheduling conflicts. As an alternative, the parents asked if the experts could appear via videoconferencing. The trial court denied both requests. After the hearing, the magistrate granted temporary custody to CCDFS. On April 19, 2023, the parents objected to the magistrate's decision. On May 9, 2023, the trial court overruled the parents' objections and adopted the magistrate's decision.

## II. Facts

{¶3} At the hearing on April 14, 2023, the facts of the case were explained to the court. On November 2, 2022, J.I. was taken to a follow-up doctor's

---

[1] R.C. 2151.031 — Abused child defined; R.C. 2151.04 — Dependent child defined; and R.C. 2151.33 — Temporary care; emergency medical treatment; reimbursement.

appointment where his doctor noticed that his head circumference was increasing at an alarming rate. The doctor ordered a CT scan and discovered liquid caused by subdural hematomas. J.I. was referred to Dr. Joshua Friedman ("Dr. Friedman"), a pediatrician and co-director of the Child Protection Team at the Cleveland Clinic. Dr. Friedman testified that J.I.'s head imaging showed that there was bleeding around the surface of his brain and that he needed an evaluation for possible child abuse and neglect. Dr. Friedman also testified that the results of the other imaging on J.I.'s brain were normal.

{¶4} Dr. Friedman further testified that child abuse is one of the causes of this type of injury, however there are other causes like birth trauma and accidents. The record reflects that J.I.'s birth was difficult in that he was born with his umbilical cord wrapped around his neck and was not breathing. Additionally, J.I.'s medical records demonstrate that he suffered from macrocephaly, an unusually enlarged head, from birth. At each of his pediatric well-child visits, his head measured abnormally large for his age and body size. On July 24, 2022, at birth, J.I.'s head measured 34.5 cm, and at his two-month doctor's visit, it measured 39 cm, demonstrating an abnormally rapid increase in head circumference. On September 15, 2022, J.I. was diagnosed with Respiratory Syncytial Virus ("RSV"), and two weeks later, his head circumference measured 42.5 cm.

{¶5} Dr. Friedman stated that after he reviewed J.I.'s imaging, he consulted with the radiologist to further review the images and the scalable exam. The

radiologist decided that J.I.'s scalable exam was normal. However, Dr. Friedman noted that he was concerned about a possible healed rib fracture, and the radiologist added it to the report.

{¶6} Next, Dr. Friedman testified that he did not interview or ask the parents about a possible history of accidents or traumas. He further stated that the likelihood of subdural hematomas from birth and birth trauma is very high, from 25 to 50 percent of all births and that from this trauma he did not suspect abuse. However, his opinion changed and he suspected child abuse because of the possible healed rib fracture.

{¶7} On cross-examination, Dr. Friedman was asked if he agreed that where a child is diagnosed with a subdural hematoma that is in fact the product of abuse or a non-accidental trauma, it is usually accompanied with many other non-accidental traumas such as skull fractures, visceral injuries, suspicious bruising, acute brain injury, internal organ injury, and cervical spine injury. Dr. Friedman agreed and stated that J.I. was not diagnosed with any of those other injuries. Dr. Friedman further testified that there was not a definitive diagnosis of a rib fracture, but a possible healed rib fracture. He also said that healed rib fractures present with callous formations, bone fragments, and formation of a fracture line. However, none of those were present in J.I.'s imaging. Dr. Friedman also agreed with another doctor's assessment that the possible rib fracture could have been caused by severe coughing from J.I.'s RSV.

{¶8} On November 5, 2022, Therese Horvath ("Ms. Horvath"), a supervisor of the Medical and Special Investigations Unit with the CCDCFS, received a report of suspected abuse from Cleveland Clinic. The report stated that J.I. had subdural hematomas and there were concerns about abuse. Ms. Horvath referred the case to caseworker Lorianne Delsignore ("Ms. Delsignore"), who was unable to testify at the hearing. However, Ms. Horvath testified that she and Ms. Delsignore had regular ongoing conferences several times a week concerning J.I.'s case.

{¶9} Ms. Horvath testified that Ms. Delsignore started the investigation immediately, interviewing the Cleveland Clinic staff, Dr. Friedman, the parents, and other people. The agency filed a complaint alleging abuse of J.I. after four eye exams were conducted on J.I. Ms. Horvath testified that there were conflicting reports from each doctor on what they observed. She also testified that the agency did not review J.I.'s birth records. Further, Ms. Horvath stated that Ms. Delsignore reported that the parents were not always cooperative with the investigation.

{¶10} On cross-examination, Ms. Horvath testified that the agency interviewed friends of the family, family members, caregivers, and no one suspected abuse of J.I. According to Ms. Horvath, the agency did not uncover any additional evidence of abuse, trauma, or injuries. Ms. Horvath also agreed that J.I.'s hematomas could be a result of a birth injury. Additionally, Ms. Horvath testified that police investigated the parents and daycare and decided to conclude their investigation. Ms. Horvath also agreed that there was no knowledge if J.I.

was actually abused, and if he was, there is no evidence that the parents committed the abuse.

**{¶11}** Further, Ms. Horvath confirmed that N.I. was not suspected of being abused, and the complaint as it pertains to N.I. was filed because of the suspected abuse of J.I.

**{¶12}** Detective Terry Wamser ("Det. Wamser"), a detective with the Seven Hills Police Department, the city where the parents live, testified that he investigated a report pertaining to the abuse of J.I. Det. Wamser testified that he spoke with the parents and the daycare and did not find anything supporting allegations of abuse. He also testified that he obtained J.I.'s medical records, and according to the medical records, "it could go either way." Tr. 109. Det. Wamser stated that he presented his findings to the prosecutor, and they declined to bring charges because there was no evidence of abuse.

**{¶13}** After the hearing, and the magistrate's decision, the trial court affirmed the decision and issued a journal entry, stating, in part: "The Court finds that the allegations of the complaint have been proven by clear and convincing evidence. The child is adjudicated to be abused and dependent." Journal Entry Nos. 0916802188 and 0916804506 (May 10, 2023).

**{¶14}** The parents filed an appeal assigning four errors for our review:

1. The trial court erred when it overruled appellants' objections to the magistrate's decisions adjudicating J.I. to be

abused/dependent and N.I. to be dependent, as the magistrate's decisions were contrary to law;

2. The trial court erred in overruling appellants' objections to the magistrate's decisions denying appellants' request for the release of CCDCFS's unredacted activity logs, as the magistrate's decisions were contrary to law;

3. The trial court erred in overruling appellants' objections to the magistrate's decisions prohibiting appellants from proffering the medical experts reports at the time of adjudication, as the magistrate's decisions were contrary to law; and

4. The trial court erred in adopting the magistrate's decisions and overruling appellants' objections to the magistrate's decisions committing J.I. and N.I. to the temporary custody of CCDCFS, as the magistrate's decision were contrary to law.

{¶15} We will review assignments of error Nos. 1 and 4 together, because they are dispositive of the case. App.R. 12.

III. **Standard of Review**

{¶16} R.C. 2151.35(A) sets forth the applicable evidentiary standard for determining whether children are abused, neglected, or dependent at an adjudicatory hearing. It provides, in relevant part:

If the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed, in accordance with division (B) of this section, to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under section 2151.353 of the Revised Code.

{¶17} "Clear and convincing evidence is that which 'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established.'" *In re E.B.*, 2020-Ohio-4139, 157 N.E.3d 826, ¶ 46 (8th Dist.), quoting *In re Pieper Children*, 85 Ohio App.3d 318, 326, 619 N.E.2d 1059 (12th Dist.1993). "If allegations in the complaint are not proved by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F)(1); R.C. 2151.35(A)(1)." *Id.*

{¶18} "When an appellate court examines whether a trial court's judgment is based upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 47, quoting *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 30. "If the trial court's judgment is 'supported by some competent, credible evidence going to all the essential elements of the case,' a reviewing court may not reverse that judgment. *Id.*, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). "Furthermore, 'an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law.'" *Id.* at *id.* "Moreover, deferring to the trial court on matters of credibility is 'crucial' in cases involving children, 'where there may be much evident in the parties' demeanor and attitude that does not translate to the record well.'" *Id.*, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

## IV. Law and Analysis

{¶19} In the parents' first and fourth assignments of error, they argue that the trial court erred when it overruled their objections and adopted the magistrate's decision adjudicating J.I. to be abused/dependent and N.I. dependent, committing the children to the temporary custody of CCDCFS.

{¶20} R.C. 2151.031(D) states that an abused child "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it." "Finally, child abuse has also been defined as '[a]n act or failure to act that presents an imminent risk of serious physical harm to a child.'" *State v. Moore*, 8th Dist. Cuyahoga No. 94446, 2011-Ohio-454, ¶ 10, quoting *Black's Law Dictionary* (9th Ed.2009).

{¶21} The record reveals that CCDCFS has failed to demonstrate that J.I.'s subdural hematomas and potential healed rib fracture was inflicted other than by accidental means. Dr. Friedman testified that this type of injury could be caused by birth trauma and accidents. He further stated that the likelihood of subdural hematomas from birth and birth trauma is very high, from 25 to 50 percent of all births and that from this trauma he did not suspect abuse. However, his opinion changed, and he suspected child abuse because of the possible healed rib fracture. Though Dr. Friedman also agreed with another doctor's assessment that the possible rib fracture could have been caused by severe coughing from J.I.'s RSV.

{¶22} Dr. Friedman was asked if he agreed that where a child is diagnosed with a subdural hematoma that is in fact the product of abuse or a non-accidental

trauma, it is usually accompanied with many other non-accidental traumas such as skull fractures, visceral injuries, suspicious bruising, acute brain injury, internal organ injury, and cervical spine injury. Dr. Friedman agreed and stated that J.I. was not diagnosed with any of those other injuries. Dr. Friedman further testified that there was not a definitive diagnosis of a rib fracture, but a possible healed rib fracture. He also said that healed rib fractures present with callous formations, bone fragments, and formation of a fracture line. However, none of those were present on J.I.'s imaging.

{¶23} Additionally, Ms. Horvath also agreed that J.I.'s hematomas could be a result of a birth injury. Ms. Horvath also agreed that there was not any knowledge of whether J.I. was actually abused, and if he was, there is no evidence that the parents committed the abuse. Det. Wamser testified that he spoke with the parents and the daycare and did not find any supported allegations of abuse. He also testified that he obtained J.I.'s medical records, and according to the medical records, "it could go either way." Tr. 109. Det. Wamser stated that he presented his findings to the prosecutor, and they declined to bring charges because there was no evidence of abuse.

{¶24} Given the testimonies of Dr. Friedman, Ms. Horvath, and Det. Wamser, there is no clear and convincing evidence that J.I. was abused.

> Clear and convincing evidence has been defined as "that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond

a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*State v. Walker*, 8th Dist. Cuyahoga No. 111656, 2023-Ohio-810, ¶ 14, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶25}** Therefore, the trial court erred in adjudicating J.I. to be abused/dependent. Because Ms. Horvath confirmed that N.I. was not suspected of being abused, and the complaint as it pertains to N.I. was filed because of the suspected abuse of J.I., the trial court erred in adopting the magistrate's decisions committing both J.I. and N.I. to the temporary custody of CCDCFS.

**{¶26}** Therefore, the parents' first and fourth assignments of error are sustained. We need not address assignments of error Nos. 2 and 3 because our resolution of assignments of error Nos. 1 and 4 is dispositive of the case. App.R. 12.

**{¶27}** Judgment reversed and remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellants recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, P.J., and
LISA B. FORBES, J., CONCUR